Karin **FLYNN,** Plaintiff,

v.

**SUN LIFE ASSURANCE COMPANY OF CANADA; and Does 1 through 10, inclusive,** Defendants.

**Case No. CV 10–4832 VBF (MANx).**

United States District Court, C.D. California, Western Division.

Aug. 10, 2011.

---

7. Defendant also requests a *Franks* evidentiary hearing, which the Court denies as moot.

Daniel W. Maguire, Kristin Kyle de Bautista, Burke, Williams & Sorensen, LLP, Los Angeles, CA, for Defendant Sun Life Assurance Company of Canada.

Roland Juarez, Jennifer D. Ellis, Admitted Pro Hac Vice, Hunton & Williams LLP Los Angeles, CA, for Defendant Pulau Electronics Corporation Employee Benefit Plan.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

VALERIE BAKER FAIRBANK, District Judge.

The Parties tried this case to the Court based on an administrative record on July 19, 2011. Plaintiff was represented by Gary Tysch. Defendant Sun Life Assurance Company of Canada was represented by Daniel Maguire of Burke, Williams & Sorensen LLP. Defendant Pulau Electronics Corporation Employee Benefits Plan was represented by Roland Juarez and Jennifer Ellis of Hunton & Williams LLP. Having reviewed the administrative record, considered all timely submissions by the Parties, and the arguments of counsel at trial, the Court makes the following findings of fact and conclusions law. Parenthetical references are to the pages of the Administrative Record, filed on June 6, 2011. (Doc. 31.)

### *FINDINGS OF FACT*

**A.** ***The Benefit Plan Offered By Pulau***

1. Plaintiff Karen Flynn is the widow of Edward Flynn ("Flynn"), one of a group of former Raytheon employees hired by Pulau Corporation on May 1, 2008. (133, 277, 280.)

2. Pulau provides program management, operation and maintenance, instructor/operator, logistics and supply chain management, vehicle repair and maintenance, live fire range and shoot house maintenance and training system relocations to the U.S. Government and other major prime contractors. (133, 280.)

3. In early 2008, Pulau began performing services for the U.S. Government at Fort Irwin, California when it was awarded a subcontract with Raytheon Technical Services Company, a company that provides services similar to those provided by Pulau. (*Id.*) Under the new contract arrangements, a large number of Raytheon employees left Raytheon and joined Pulau, as new hires. (*Id.*) Flynn, Plaintiff's deceased husband, was one of those employees and began his employment with Pulau on May 1, 2008. (133, 277, 280.)

4. New Pulau employees, including Flynn, were offered the opportunity to participate in Pulau's ERISA-governed benefit plan. The Pulau benefit plan is self-administered. (270–71.) Pulau struc-

tures the benefit package and is responsible for enrollment of eligible participants in all plan benefits. Pulau maintains all enrollment records, including enrollment forms and billing information. (*Id.*) The terms, conditions and limitations of the benefits are governed by the plan documents.

5. The new employees, including Flynn, could choose between two benefit options. (280.) Option 1, known as the "insurance option," allowed participation in Pulau's Group Health and Welfare Plan. (113–14, 283–84.[1]) This included a total package of medical, dental, vision, disability and life insurance under group insurance policies issued to Pulau by various insurers, among other Company benefits. (*Id.*)

6. Option 2, the "extra pay" option, offered an additional $3.16 per hour, in lieu of any participation in the Health & Welfare Plan. (113–14; 285–86.) The extra pay would enable the employee to purchase his or her own insurance, if they so desired. (285.)

7. Option 1 was all or nothing. The new hire could not pick and choose which of the insurance coverages he or she wanted. (113–14, 283–84.) The insurance package had to be accepted as a whole. Within Option 1, the life insurance benefit was funded by Pulau through a group insurance policy issued by Sun Life, effective October 1, 2003. (168.)

8. A Memorandum describing the choice between Options 1 and 2 and enclosing copies of both benefits options, was provided to the new Raytheon hires, including Flynn, by Memorandum dated May 1, 2008. (282–86.)

9. The group life insurance policy allowed Flynn to elect basic life coverage of $50,000. (171.) Under the guaranteed issue provision of the Sun Life policy, optional life insurance coverage was limited to the lesser of three times annual earnings or $50,000. (172, 123.) The guaranteed issue amount is defined as follows:

"**Guaranteed Issue Amount** means the maximum amount of insurance available under this Policy without Evidence of Insurability. If the Employee's or Dependent's amount of insurance exceeds the Guaranteed Issue Amount available under this Policy, any amount in excess of the Guaranteed Issue Amount is available to the Employee or Dependent *only if he has furnished Evidence of Insurability to Sun Life and has been approved* for any excess amount above the Guaranteed Issue Amount." (176) (emphasis added).

10. Additional optional coverage up to the lesser of $500,000 or five times his annual earnings was available, but only if Flynn submitted, and Sun Life accepted, his Evidence of Insurability application. (171–72.) At the time of his death, Flynn's Basic Annual Earnings were $50,000. (277.) Flynn acknowledged the Evidence of Insurability requirement on the enrollment form. (123.)

### B. *Flynn Initially Selected The Insured Option*

11. In May 2008, Flynn initially selected Option # 1—i.e., to participate in Pulau's health and welfare plan. However, rather than enrolling in all of the benefits packages that make up Pulau's Option # 1,

---

1. At trial, Plaintiff's counsel objected to the admission of Administrative Record pages 282 to 296. Those objections are overruled. No written objections were filed by Plaintiff, even though the Administrative Record was filed on June 6, 2011. (Doc. 31.) At trial, counsel for Sun Life represented that the Administrative Record was circulated to Plaintiff's counsel 10 days prior to filing with an invitation to object or modify, and no response was received from Plaintiff. Plaintiff's counsel did not contest that representation.

Flynn attempted to enroll in life, dental, vision, and disability insurance, and then attempted to decline participation in other benefits, such as medical insurance. (117, 120.) This was not a proper election of coverage. (283–286.)

12. Similarly, Flynn incorrectly completed the optional life insurance enrollment form. He attempted to apply for $500,000 in optional life insurance coverage, although his Optional Maximum Benefit was $250,000.[2] (123.)

13. Although Flynn could not obtain optional life insurance coverage beyond $50,000 without providing evidence of insurability and obtaining approval from Sun Life for any excess amount above $50,000, he never submitted such evidence of insurability and never obtained any such approval from Sun Life. (5, 26, 108.)

14. Because Flynn had selected Option # 1, which included the health insurance package (i.e., medical, dental, vision), short and long term disability insurance, and basic life insurance coverage, and because he never submitted evidence of insurability for optional life insurance above $50,000, Pulau began deducting the appropriate employee contributions, including $80.00 for health insurance beginning with his June 4, 2008 paycheck, and $15.95 for the $50,000 in optional life insurance, $14.03 for short term disability insurance, and $8.97 for long term disability insurance, beginning with Flynn's June 18, 2008 paycheck. (124.)

15. Pulau enrolled the new hires in the Meritain health insurance policy in May and set-up the payroll deductions to begin in the employees' June 4, 2008 paycheck. (124.) Pulau did not begin processing enrollments for the life insurance policy until June. (125, 133.) Although Vickie Wasik,

HR Administrator at Pulau, set up Flynn's payroll deductions for the $50,000 in optional insurance coverage to begin in his June 18, 2008 paycheck, she did not complete his enrollment with Sun Life because she wanted to speak with Flynn first. (276.)

16. In fact, when Ms. Wasik first received the life insurance enrollment forms, she noted Flynn's improper election, and observed that he could only elect $100,000 of total coverage without evidence of insurability. (*Id.*) This is why Ms. Wasik held off on completing Flynn's enrollment in the group life insurance policy and noted she would need to speak with Flynn about this issue. (*Id.*) Flynn never submitted evidence of insurability. (5, 26, 108.) Therefore, the application process was never completed.

## C. *Flynn Cancels the Enrollment Process Before It Is Complete*

17. Upon noticing the $80.00 deduction for health insurance in his June 4, 2008 paycheck, Flynn sought clarification from Katrina Griego, another Pulau employee, regarding his benefit options. (281.) He inquired whether he could participate in only some of Pulau's benefits or whether he had to participate in all of them, and asked Ms. Griego if she could find out for him. (*Id.*)

18. Ms. Griego contacted Ms. Wasik, who explained to Ms. Griego that the benefits were a "package deal." (*Id.*) Ms. Wasik asked Ms. Griego to have Flynn call her, so she could make sure all of his questions were answered and that he fully understood. (*Id.*) When Ms. Griego explained all of this to Flynn, he told her that he "more than likely would be collecting the $3.16" but that he would call Ms. Wasik

---

**2.** Flynn's Optional Maximum Benefit was the lesser of $500,000 or 5 times his Basic Annual Earnings. (171.) At the time of his death,

Flynn's Basic Annual Earnings were $50,000. (277.)

just to make sure "things were straight." (*Id.*)

19. On June 11, 2008, Flynn spoke with Ms. Wasik. (113–14, 276, 280.) She explained that if he wanted life insurance, he also had to pay for the health insurance package. (*Id.*) Flynn did not want medical insurance because he already had such coverage through his wife's employer. He therefore explained to Ms. Wasik that he changed his mind and did not want Option # 1. (*Id.*)

20. Ms. Wasik reiterated to Flynn the consequences of that election, including that he would not be eligible for either the basic or the optional life insurance, and repeatedly asked if selecting Option # 1 was what he really wanted to do. (*Id.*) He voiced his understanding, and stated he wanted to receive the additional $3.16 per hour "right away." (*Id.*)

21. Because Pulau's processing of the former Raytheon employees' life and short and long term disability insurance enrollments had not yet been completed or submitted to the insurers, including Sun Life, Ms. Wasik allowed Flynn to stop the enrollment process. (133–34, 280.) Ms. Wasik recorded Flynn's declination of coverage in writing on the benefits enrollment forms he had previously submitted, on copies of memoranda he received regarding his benefits, and on an Employee Change of Status Authorization form. (117, 121–23, 127, 130–31.)

22. Ms. Wasik also adjusted Flynn's payroll so that he would begin receiving the $3.16 per hour payment effective June 9, 2008, and reimbursed him for any deductions for the optional life insurance coverage and short and long term disability coverage.[3] (125–26.) His paychecks, beginning with the paycheck dated July 2, 2008, reflect that Flynn was receiving the $3.16 per hour payment at the time of his death. (*Id.*)

### D. *Flynn's Death and Plaintiff's Life Insurance Claim*

23. On July 27, 2008, Flynn died as the result of a heart attack. (158, 163.)

24. In August or September 2008, Flynn's son, Thomas, contacted Pulau, requesting that Pulau send Plaintiff pertinent information concerning Flynn's life insurance coverage. (113–14.)

25. Toni L. Tattoli, then Director of Human Resources, spoke with and obtained written statements from both Ms. Wasik and Ms. Griego. (280–81.) After review of this information, and Flynn's file, Ms. Tattoli sent a letter to Plaintiff, dated September 3, 2008, explaining that although Flynn had initially chosen Option # 1 of Pulau's benefits package, his election was cancelled at his request prior to completion of the enrollment process. (113–14.)

26. Ms. Tattoli explained that once the deductions started being taken out of Flynn's paycheck, he decided that he did not want Option # 1 but wanted to receive the $3.16 per hour payment instead. (*Id.*) Ms. Tattoli attached copies of the benefit options Flynn received when he was hired by Pulau, as well as the Change of Status Authorization form on which Ms. Wasik recorded in writing Flynn's decision to cancel his election,[4] and the Payroll Journal showing that Flynn was receiving the $3.16 per hour payment effective June 9, 2008. (*Id.*)

---

**3.** Because Flynn was already enrolled in the Meritain health insurance policy, Pulau terminated his coverage as of June 30, 2008, and he was not reimbursed for coverage for that period. (124–26, 127, 280.)

**4.** Ms. Wasik's notation on the Change of Status Authorization form to "cancel insurance coverage 6/30/08" referred to Flynn's Meritain health insurance coverage. (127, 280.)

27. Pulau considered the following information and documents in responding to Plaintiff's son: (1) the Policy documents; (2) Pulau's informational sheets describing Options # 1 and # 2 (282–86); (3) Flynn's Employee Records Jacket (277); (4) the welcome letter and Employee Packet provided to Flynn at the time of hire (287–96); (5) Flynn's completed enrollment forms, on which Ms. Wasik noted his June 11, 2008 change in election from Option # 1 to Option # 2 (117–23); (6) the May 19, 2008 and June 5, 2008 memoranda to Flynn regarding his insurance coverages, on which Ms. Wasik noted his change in election (130–31); (7) Employee Change of Status Authorization forms, on which Ms. Wasik noted Flynn's change in election (127–28); (8) Flynn's payroll register (124–26); and (9) the August 20, 2008 and August 21, 2008 written statements from Ms. Wasik and Ms. Griego, explaining the circumstances regarding Flynn's change in election (280–81).

28. Six months later, on March 23, 2009, Plaintiff completed a claim packet, which Sun Life received on April 22, 2009. (164–167.)

29. Upon receipt of the claim, Sun Life commenced its investigation. As part of that investigation, Sun Life contacted Pulau, spoke to its attorney on April 30, 2009, and obtained relevant information and documentation from Pulau. (94, 98, 133–57).

30. In preparing its response to Sun Life, Pulau again reviewed and relied upon the documents enumerated above, as well as a December 15, 2008 letter from U.S. Army Captain and Legal Assistance Attorney Donel J. Davis (279) and a March 2, 2009 memorandum from Ms. Wasik (276).

31. On May 21, 2009, Sun Life determined that no benefits were payable. (107–110.) In its written claim decision, Sun Life stated that Flynn could only have qualified for the guaranteed issue amounts of $50,000 basic and $50,000 optional coverage without Sun Life's approval of his Evidence of Insurability application, had he not opted out of the insurance package entirely. However, by electing and receiving the extra pay, he had opted out of the life coverage, and no benefits were payable.

32. Mrs. Flynn hired counsel who wrote an "intent to appeal" letter to Sun Life on December 28, 2009, requesting the plan documents and administrative record. Sun Life sent Plaintiff's counsel that documentation on December 30, 2009(91), and counsel submitted Plaintiff's appeal on April 30, 2010(22), raising a number of arguments.

33. Sun Life upheld its decision on appeal. (4–7.) Sun Life noted the appeal was not timely, but it was nevertheless considered on its merits.

34. Sun Life addressed the basis for its original decision, and responded to the arguments raised by Plaintiff's counsel in the administrative appeal, explaining that no benefits were payable because:

- Flynn had opted out of the benefits package that offered insurance coverage.

- Flynn had not submitted Evidence of Insurability; therefore, he would not have been eligible for any amount over $100,000 in total coverage under any circumstances.

- Flynn had elected and received the increased pay benefit at Pulau.

- The grace period provisions of the policy did not create coverage, as those provisions relate only to the period during which the coverage has been in premium payment status by the policyholder.

- The conversion privilege under the policy did not apply because Flynn's voluntary opt-out of the benefits

package did not trigger a conversion right.

35. Plaintiff was advised of her right to sue under ERISA § 502(a)(1)(B). She filed the instant lawsuit on June 28, 2010, challenging Sun Life's decision denying the payment of life insurance benefits and coverage under the Policy. (Doc. 1.)

## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. This Court has jurisdiction, pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Venue is proper in the Central District of California, as the District in which the claims arose and in which Defendants may be found.

### B. Standard of Review and Scope of Review

#### 1. The Court Has Reviewed Sun Life's Decision De Novo

■ 2. A Court reviews a denial of ERISA benefits de novo unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Because the Sun Life policy does not contain discretionary language, this Court has reviewed Sun Life's claim determination under a de novo standard of review. *Id.*; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) en banc.

■ 3. When a benefits claim is subject to de novo review, a Court must review the claim by interpreting the governing plan documents without deferring to any party's interpretation. *Bruch*, 489 U.S. at 112–13, 109 S.Ct. 948. The Supreme Court has instructed us to review an employee's claim "as it would ... any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent." *Id.*

#### 2. The Court May Consider Extra–Record Evidence Necessary To Its Determination

■ 4. In most ERISA actions governed by de novo review, only the administrative record is admitted into evidence at trial. *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir.1995). In this matter, the Court finds that the administrative record includes the documents that were reviewed and/or relied upon by Pulau, as evidenced in the declaration of Vickie Wasik. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 n. 4 (9th Cir.2009) ("In the ERISA context, the 'administrative record' consists of 'the papers the [administrator] had when it denied the claim.'"). Such declarations are admissible for purposes of establishing the Administrative Record. *See, e.g., Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457–58 (6th Cir.2003) ("Therefore, because [then-Director of Employee Relations] would have personal knowledge of the administrative record available to the plan administrators at the time of their final decision, we find that the district court did not abuse its discretion by relying on [his] affidavit to determine the administrative record.")

■ 5. Moreover, the Court may consider new evidence if circumstances establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision. *See id.* at 943–44; *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir.2007). Sun Life has suggested that if the Court finds it necessary to reach a determination of whether coverage was ever placed in force for Flynn, the Declaration of Kristin Goodwin and exhibits thereto may be considered. Her Declaration attaches screen shots from Sun Life's computer demonstrating that Flynn was never enrolled

with Sun Life under the policy at issue. (Exh. 1 to Goodwin Decl.)

6. Plaintiff has the burden of proving entitlement to benefits under the Plan. *See Seleine v. Fluor Corp. LTD Plan,* 598 F.Supp.2d 1090, 1100 (2009) aff'd 409 Fed. Appx. 99 (9th Cir.2010); *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998). The evidence in the Administrative Record demonstrates that Pulau returned the premiums deducted from Flynn's paycheck directly to Flynn, rather than submitting them to Sun Life. (125.) The evidence in the Administrative Record also demonstrates that Pulau never sent any premiums for Flynn to Sun Life. This fact is undisputed. Again, had there been doubt on the issue, Ms. Goodwin's declaration is admissible to prove no premiums were paid to Sun Life.[5]

C. **Sun Life's Decision to Deny Benefits Is Fully Supported by the Law and the Administrative Record**

1. **Flynn Never Completed the Enrollment Process and was Not, Therefore, Covered by the Sun Life Policy**

a. **Flynn Completed the Enrollment Forms Incorrectly**

■ 7. Flynn initially made improper elections and incorrectly completed the enrollment forms. He chose life insurance, but attempted to decline medical insurance, and he chose a life insurance amount that was invalid for him. (117, 120, 123.) As a matter of law, the Court finds that these improper elections fully and independently support a denial of benefits. *See, e.g., Alexander v. Provident Life & Acc. Ins. Co.,* 153 F.3d 718, *4 (4th Cir.1998). In *Alexander,* the plan administrator denied life insurance benefit payments under a "Member Only" policy to the decedent's widow, on the basis that the decedent's coverage was invalid because of his improper completion of the enrollment card. *Id.* at *1. Specifically, the decedent attempted to enroll in a "Member Only" policy, when he was already listed and insured as a dependent under his wife's "Member and Family" policy. *Id.* The court found that the decedent improperly completed his enrollment card, as the plan clearly prohibited duplicate coverage for family members, and that his coverage was therefore invalid. *Id.* at *4. In upholding the denial of benefits, the court held that the plan administrator acted correctly when it canceled the decedent's coverage under the "Member Only" policy after his death and refunded the premiums deducted in error to his estate. *Id.*

8. Similarly, here, Flynn's improper completion of the optional life insurance enrollment application, his improper election of benefits offered by Pulau, and his seeking coverage precluded by the policy without evidence of insurability, resulted in the coverage being invalid. Pulau's cancellation of the enrollment process and return to Flynn of any payroll deductions, was therefore proper.

b. **Flynn Withdrew His Original Application**

■ 9. The Court also finds that Flynn's withdrawal of his application for life insurance, and his decision that he did not want life insurance coverage, is a second and independent reason supporting denial of claim. During his June 11, 2008 conversation with Vickie Wasik, Flynn told Ms. Wasik that he had "changed his mind," and withdrew his election for the

5. Plaintiff objected to extra-Administrative Record evidence submitted by Defendants in the form of Declarations of Kristen Goodwin and Vickie Wasik. The Court denies those objections. The Court holds that the Wasik declaration is admissible to establish the content of the Administrative Record, and the Goodwin Declaration is admissible to demonstrate that Sun Life never received premiums for Flynn's coverage.

Option 1 insured plan in favor of the Option 2 increased pay package. (276, 280.) Ms. Wasik therefore promptly voided his Sun Life enrollment forms, and effectuated his increased pay option on the payroll system effective June 9, 2008. (122–23, 125.)

10. Due to the defects on Flynn's application, Pulau never submitted Flynn's enrollment forms to Sun Life, and Flynn later withdrew them. (276, 280.) Because the Sun Life coverage never went into effect, it did not need to be "terminated," and Flynn could effectively withdraw his application and refuse coverage.

11. Flynn's ultimate decision to withdraw his enrollment for coverage did not have to be in writing. Contrary to Plaintiff's assertion at trial, the Court finds that Sun Life's policy does not require an employee to refuse coverage in writing. Plaintiff misreads the following policy provision:

**Refusal of Coverage**

If an eligible Employee declines his insurance, or terminates his insurance in writing while continuing to be eligible, the Employee will become insured after he applies for insurance and Evidence of Insurability is approved by Sun Life. (182.)

12. Nothing in this language requires an employee to decline insurance coverage in writing. The only reference to "writing" in this provision relates to termination of insurance. In that respect, the policy provides that if the employee terminates his insurance in writing (while still eligible), he or she may become insured only after he applies for the insurance and submits evidence of insurability approved by Sun Life.

13. Plaintiff also cites a provision from the employee handbook which states as follows:

**What happens if I do not want my Insurance?** You need to sign a form refusing your insurance. This form is available from your Employer. If you decide later you want to enroll for insurance, Sun Life must first approve your Evidence of Insurability. (223.)

14. It is evident from the Administrative Record that Pulau considered Flynn's declination of coverage, which was confirmed in writing on his enrollment form, to satisfy this provision. (122–23.) Even if this were not the case, however, the provision does not apply because Flynn did not originally refuse the coverage; he elected it. Flynn later changed his mind and withdrew that election, a request that Pulau honored. (276, 280.) The handbook is silent as to what if anything was required in that instance, and as Plan Administrator, Pulau had the right not to insist on the submission of a particular form by Flynn.

**d. *Sun Life Never Received Premiums or Enrollment Forms for Flynn***

12. There is no evidence in the record that Flynn's enrollment forms were submitted by Pulau to Sun Life. This is because when Pulau reviewed them, Vickie Wasik noticed they were deficient (by reason of the election of an unavailable amount, and the failure to submit evidence of insurability). (276.) There is also no evidence that any premium was paid to Sun Life for Flynn's coverage.[6] The Court finds that because Flynn was never enrolled at Sun Life by Pulau and no premiums were paid on his behalf, he was not entitled to coverage under the policy.

---

**6.** The Court also notes that this conclusion is reinforced by the Declaration of Kristin Good-

win.

### 2. *Flynn's Election of Extra Pay Operated As a Novation*

█ 16. Even if Flynn's election of the insured option had become effective as to the Sun Life policy, this Court concludes that his later substitution of the increased pay option and actual receipt of the increased pay operated as a novation, thereby extinguishing any liability Pulau and/or Sun Life would have had under the Sun Life policy. Because there is no federal law of contracts, the Court's interpretation of novation is informed by state law even though the application of a federal statute is involved. *See Vernon v. Resolution Trust Corp.,* 907 F.2d 1101, 1109 (11th Cir.1990); *In Re Aslan,* 909 F.2d 367, 369 (9th Cir.1990).

17. Flynn's exercise of the increased pay option governs the relationship between Flynn and Pulau. Novation is "the substitution of a new obligation for an existing one." *Fanucchi & Limi Farms v. United Agri Products,* 414 F.3d 1075 (9th Cir.2005) (quoting Cal. Civ.Code § 1530). Novation may be accomplished either by the substitution of a new debtor or a new creditor, or "[b]y the substitution of a new obligation between the same parties, with the intent to extinguish the old obligation." Cal. Civ.Code § 1531(1). Novation wholly extinguishes the earlier contract. *See Davies Mach. Co. v. Pine Mountain Club, Inc.,* 39 Cal.App.3d 18, 25, 113 Cal.Rptr. 784 (1974).

18. In examining a novation claim, the Court first looks to the agreements themselves. *See Alexander v. Angel,* 37 Cal.2d 856, 861–62, 236 P.2d 561 (1951). Here, Pulau's Plan documents clearly describe the two benefit package options. (282–86.) Flynn could choose one or the other, not both. The insured option was "all or nothing," not a cafeteria arrangement. (283–84.) In examining a novation, we also take into consideration the conduct of the parties, particularly where the subsequent agreement is oral. *See Fanucchi, supra,* 414 F.3d at 1082. Indeed, "it is not necessary to meet and to state either in writing or orally that the original contract was rescinded. 'If the intent to abandon can be ascertained from the acts and conduct of the parties, the same result will be attained. Abandonment may be implied from surrounding facts and circumstances.'" *Id.* citing *Hunt v. Smyth,* 25 Cal.App.3d 807, 818, 101 Cal.Rptr. 4, and *Tucker v. Schumacher,* 90 Cal.App.2d 71, 75, 202 P.2d 327 (1949).

19. Here, the surrounding circumstances are clear that Flynn changed his mind and decided to elect the extra pay option, in place of the insured option. His choice made sense. It was motivated by the fact that he already had medical coverage, and did not want to pay for duplicate coverage. He understood that the insured option was all or nothing. Ms. Wasik at Pulau explained to him the consequences of his choice—he would not be eligible for any life insurance coverage through Sun Life. (276, 280.) Flynn nevertheless elected to receive increased pay. (*Id.*)

### 3. *Flynn's Receipt of Extra Pay Operated as an Accord and Satisfaction*

█ 20. Similarly, even if Flynn's election of the insured option had become effective as to the Sun Life policy, this Court concludes that his later substitution of the increased pay option and actual receipt of the increased pay operated as an accord and satisfaction. Under California law, an accord is defined as "an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." Cal. Civ.Code § 1521. Once "the something different" has been delivered, there has been satisfaction of the accord. Cal. Civ.Code § 1523; *Fanucchi,* 414 F.3d at 1086.

21. Until the accord is fully executed, the original obligation is not extinguished. *See id.* at 1086, citing *Gardiner v. Gaither,* 162 Cal.App.2d 607, 621, 329 P.2d 22 (1958). Here, Flynn received the extra pay starting June 9, 2008, as reflected by the payroll records. (125.) At that time, the accord was fully executed, and any original obligation to provide life insurance pursuant to his original enrollment forms was thereby extinguished under the principles of accord and satisfaction.

### 4. *Even if coverage attached, the coverage was terminated.*

■ Even if it can be argued that Flynn somehow enrolled in the policy, review of the policy terms confirms that he most certainly terminated his coverage before his death. The policy provides that insurance terminates on the last day for which any required premium has been paid. (200.) It is undisputed that no premiums were being paid by Flynn to anyone (not even Pulau) at the time of his death. The sole payroll deduction for the life coverage (which was never forwarded to Sun Life) was reimbursed to Flynn by Pulau over a month before his death. (124–25). Thus, any coverage was most certainly terminated before Flynn's death.

### D. *Plaintiff's Arguments for Coverage Fail*

### 1. *There Was No Waiver of Defenses*

22. At trial, Plaintiff suggested that Defendants waived or are estopped from asserting certain arguments advanced in their opening briefs and at trial, because they were not advanced as a basis for denial of her claim or upholding that claim determination on appeal. The Court finds that Plaintiff's arguments on this point are without merit.

23. The Court recognizes the Ninth Circuit's instruction that District Courts are limited to review of the reasons for denial asserted during the administrative process to prevent an administrator from sandbagging an employee "by a rationale the plan administrator adduces only after the suit has commenced." *Jebian v. Hewlett–Packard Co. Employee Benefits Plan,* 349 F.3d 1098, 1104–05 (9th Cir.2003). However, the Court finds this authority inapplicable to this case for two reasons.

24. First, there is no factual basis for Plaintiff's assertions that Defendants employed a new rationale after suit was commenced. The arguments advanced by Defendants in litigation are consistent with those relied upon in support of the claim denial, and in upholding the denial on appeal. During the administrative process, Defendants took the position that Flynn was not entitled to life insurance benefits because he opted out of the insured option (5, 6, 108), elected and received extra pay instead (*id.*) and failed to submit evidence of insurability. *Id.* These same arguments were presented in litigation and at trial, and indeed form the basis for the Court's decision.

■ 25. Second, concepts of waiver or estoppel cannot be used to create coverage beyond that actually provided by an employee benefit plan. *See, e.g., Lauder v. First Unum Life Ins. Co.,* 284 F.3d 375 (2nd Cir.2002); *Juliano v. Health Maintenance Org. of New Jersey, Inc.,* 221 F.3d 279, 288 (2nd Cir.2000); *Shutts v. First Unum Life Ins. Co.,* 310 F.Supp.2d 489, 494 (N.D.N.Y.2004).

26. Finally, the Court notes that the threshold argument advanced by Defendants and adopted by the Court is that Flynn *never became insured in the first place* under the Sun Life policy. This is not a case where the insurer or claims administrator relied on a different interpretation or legal argument on a coverage issue in litigation. Rather, the position of Defendants was consistent throughout the claims process and the litigation that

Flynn never completed the enrollment process under the rules established by Pulau, and was therefore never insured under the Sun Life policy.

### 2. Coverage Did not Start on the First Day of Flynn's Employment

27. Plaintiff argues that Flynn's coverage attached on his first day of employment. Based on the Plan language, the Court rejects this argument, because there is a distinction between eligibility for benefits, and enrollment in Pulau's benefit package. Upon joining Pulau as an employee, Flynn was eligible to choose between its two benefit option plans. (282.) In order to *participate* in either of those packages, however, he was required to do two things—elect one of the packages, and, for the insurance option, enroll in coverage. As explained above, Flynn never properly enrolled in the Sun Life coverage, and even if he had, he withdrew that enrollment prior to it becoming effective.

### 3. Delivery to Pulau of Enrollment Forms Does not Support Coverage

28. Plaintiff seems to suggest that even though Flynn was never enrolled in the Sun Life policy by Pulau and no premiums were paid to Sun Life on his behalf, he nevertheless enrolled in the coverage through Pulau, and that Pulau acted as Sun Life's agent both for purposes of receiving the enrollment forms and the premium payment (through payroll deduction).

29. Plaintiff's argument fails because the policy specifically provides that the employer is not deemed an agent of Sun Life. (206.) In *UNUM v. Ward*, 526 U.S. 358, 379, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999), the United States Supreme Court held that California law deeming an employer to be the agent of the insurance company in administering group insurance policies was preempted by ERISA, and that such agency laws are not within the

"saving" clause of ERISA. Subsequent cases have therefore given effect to these "no agency" provisions in ERISA policies. *See, e.g., Adamson v. UNUM*, 455 F.3d 1209, 1216 (10th Cir.2006).

30. This was a group life insurance policy governed by ERISA, which was self-administered by the employer, Pulau. (270–271.) The policy language that Pulau should not be considered an agent of Sun Life is clear, unambiguous and enforceable. (206.) *See Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir.2002). Further, California state law deeming an employer as the insurer's agent is preempted by ERISA. *See UNUM*, 526 U.S. at 379, 119 S.Ct. 1380. Therefore, the Court concludes that Pulau was not Sun Life's agent for any purpose. In any event, the payroll deduction was reversed and refunded by Pulau following Flynn's election of extra pay, long before his death. (124–25.)

### 4. Flynn's Prior Coverage at Raytheon Does not Support Coverage with Sun Life

31. Plaintiff suggests that Flynn was covered by Sun Life because he was previously insured by Raytheon prior to his hire by Pulau. This argument also fails. The Sun Life policy contains a Continuity of Coverage provision, but that provision applies only when an employer changes insurers, not when an employee changes employers. Sun Life's policy language explicitly addresses the situation where an employer switches insurers:

**Continuity of Coverage**

In order to prevent loss of coverage for an Employee *when this Policy replaces a group Life policy the Employer had in force with another insurer* immediately prior to October 1, 2003, Sun Life will provide the following coverage.

**Employees not Actively at Work[7] on October 1, 2003**

> An Employee may become insured under the Policy on October 1, 2003, subject to all of the following conditions:
>
> (1) he was insured under the prior insurer's group Life policy immediately prior to October 1, 2003; *and*
>
> (2) he is not Actively at Work on October 1, 2003; *and*
>
> (3) he is a member of an Eligible Class under this Policy; *and*
>
> (4) premiums for the Employee are paid up to date; *and*
>
> (5) he is not receiving or eligible to receive benefits under the prior insurer's group life policy." (191) (emphasis added).

32. The Court is required to apply the clear and unambiguous terms of the plan document. *See Padfield v. AIG Life Ins. Co., supra.* This is not a situation where the Sun Life policy replaced an existing policy Pulau had with another insurer. Therefore, the Continuity of Coverage provision does not apply. Even if the provision were applicable, Flynn did not satisfy either the first or fourth conditions above: (1) he was not insured under Pulau's prior insurer's group life policy (Sun Life issued this policy to Pulau back in 2003(168)), and (4) premiums were not paid up to date. Flynn is therefore not entitled to coverage under the continuity of coverage provision.

**5. *Neither Conversion Coverage Nor Grace Period Coverage Applies***

■ 33. Plaintiff's argument that Flynn was eligible for conversion coverage fails under the policy language. As a preliminary matter, Flynn was never insured in the first place, and therefore, his coverage could not have "terminated." More-over, the conversion privilege states as follows:

> 1. If all or part of an Employee's Life Insurance ceases or reduces due to:
>
> — Termination of his employment; or
>
> — Termination of his membership in an Eligible Class; or
>
> — The Employee's retirement; or
>
> — The Employee reaching a specified age; or
>
> — The Employee changing to a Eligible Class; or
>
> — Termination of the Employee's Waiver of Premium continuation; or
>
> — The Employee's continuation period ending during layoff or an approved leave of absence;
>
> — Then the Employee may apply for an individual policy on his own life up to the amount that ceased. (189.)

34. Plaintiff fails to explain which of these conditions Flynn satisfied. The record demonstrates that he satisfied none of them. Moreover, there could be no "amount that ceased" under the language of the policy because, as stated previously, the Court is of the opinion that Flynn never had life insurance coverage in force in the first place.

■ 35. Similarly, the grace period provision does not operate to manufacture coverage for Flynn. The grace period provision applies only to the group policy itself, not to individual certificates issued thereunder. The policy states:

> The Grace Period is 31 days following a premium due date. During the Grace Period, the Policy shall continue in force, unless the Policyholder has given Sun

---

7. Actively at work is defined as full time work for the employer (Pulau). (175.) Therefore, Flynn's work at Raytheon does not qualify.

Life written notice to discontinue this policy.... (210.)

The "policyholder" is defined as "Pulau Electronics Corporation" (168), not as employees of Pulau.

### 6. *The Doctrine Of Temporary Insurance Does Not Create Coverage For Flynn*

██ 36. As part of her administrative appeal to Sun Life, Plaintiff argued that under the California doctrine of temporary insurance, coverage was created when payroll deductions were taken from Flynn by Pulau. She further argued that the fact that these payments were never submitted to Sun Life is irrelevant because Pulau was acting as Sun Life's agent at the time the payroll deductions were taken. The Court finds that Plaintiff's argument fails for several reasons.

37. First, this argument fails under California's temporary insurance statute. The temporary insurance doctrine does not apply to group insurance policies. *See* Cal. Ins.Code § 10115. The statute allows temporary coverage for policies *"other than group life insurance"* if (1) the premium payment is accepted with an application or the insurer receives the payment at its home office, (2) the insurer approves the application pursuant to its regular underwriting practices and standards for the rate and plan applied for, and (3) the applicant dies on or after the date requested in the application for the policy to be effective, but before the policy is issued and delivered. *Id.*

38. Second, even if this doctrine applied to group life insurance, which it clearly does not, no temporary insurance would have been created because the policy specifically provides that no coverage will be effective until premiums are paid to the *insurer.* (168.) As explained above, Pulau is not Sun Life's agent, so its payroll deduction did not constitute premium pay-

ment to Sun Life. Moreover, the single premium deduction was reimbursed in the pay cycle immediately following Flynn's election of extra pay, well before his death. (125.) Additionally, Sun Life did not approve the application. Evidence of insurability was required, yet never submitted. (5, 26, 108.) Therefore, the requirements of the temporary insurance statute have not been satisfied in order for the Court to apply the doctrine to this case.

██ 39. Third, California's temporary insurance doctrine is preempted by ERISA. On this point, the Court is persuaded by the decision in *Arocho v. Goodyear Tire and Rubber Co.*, 88 F.Supp.2d 1175, 1183 (D.Kan.2000). In *Arocho*, the plaintiff sued the insurer and the deceased husband's employer, seeking to recover benefits under an optional life insurance plan. The insurer refused payment because the decedent died two days prior to the effective date of the policy. The court held that the temporary insurance doctrine was preempted by ERISA, and the fact that the employer began payroll withholding one month earlier than the effective date did not accelerate the date for coverage. *Id.*

### 7. *Plaintiff's "Entire Contract" argument has no merit.*

██ 40. Plaintiff also seems to rely on the "Entire Contract" provision of the Sun Life policy. Sun Life argues this provision is inapplicable, and the Court agrees. That provision states:

**Entire Contract—Policy Changes**

1. This Policy is the entire contract. It consists of:

   a. all of the pages of the Policy;

   b. the attached Application of the Policyholder;

   c. each Employee's written application for insurance (Employee retains his own copy).

2. This Policy may be changed in whole or in part. Only an officer of Sun Life may approve a change. The approval must be in writing and endorsed on or attached to this Policy.

3. Any other person, including an agent, may not change this Policy or waive any part of it. (204.)

41. As a threshold matter, Flynn's declination of the Sun Life policy and coverage renders the Sun Life policy inapplicable to his claim. His enrollment form was never submitted to Sun Life. The enrollment form therefore never became part of that contract. The Administrative Record is clear that Flynn affirmatively declined the Sun Life coverage, accepted increased pay in its place, and was refunded the initial salary deduction attributable to the Sun Life coverage (which itself was never sent to Sun Life).[8] (276, 280–81, 124–26.)

42. Accordingly, in light of the above-stated findings of fact and conclusions of law, the Court finds in favor of Defendants and orders that Judgment shall be entered in favor of Defendants. Plaintiff shall recover nothing against Defendants. Defendants shall be entitled to recover costs of suit pursuant to 28 USC § 1920. Defendants may also be entitled to recovery of reasonable attorney's fees pursuant to ERISA § 502(g)(1); 29 U.S.C. § 1132(g)(1); 2 ERISA Practice and Procedure § 8.3. In cases such as the one presently before the Court, the award of attorney's fees is within the discretion of the Court.

---

8. The Parol Evidence Rule does not advance Plaintiff's case either. That rule simply bars oral testimony or extrinsic evidence offered to vary the terms of a written contract. *See Cruzan v. Missouri Department of Health*, 497 U.S. 261, 284, 110 S.Ct. 2841, 2854, 111 L.Ed.2d 224 (1990). It is unclear what evidence Plaintiff wishes to exclude, or what evidence purportedly varies the terms of any contract.